IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SIEMENS WATER TECHNOLOGY CORP., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-cv-3272 |
| | § | |
| TRANS-UNITED, INC., | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

This case is before the Court on Defendant Trans-United, Inc.'s ("Defendant") Second Motion for Summary Judgment [Doc. # 48] (the "Motion") and Plaintiff Siemens Water Technology Corporation's ("Plaintiff") Cross Motion for Partial Summary Judgment [Doc. # 51] (the "Cross Motion").[1] The matter is fully briefed and ripe for decision. The Court has carefully reviewed the entire record, the parties' arguments, and applicable law, and concludes Defendant's Motion and Plaintiff's Cross Motion should be **denied.**

---

[1]  Defendant filed a Supplement to the Motion [Doc. # 49], and Plaintiff filed a Response to the Motion [Doc. # 50] ("Plaintiff's Response"). Defendant filed a Reply to the Response to the Motion [Doc. # 52] ("Defendant's Reply") and a Response to the Cross Motion [Doc. # 55] ("Defendant's Response"). Plaintiff filed a Reply to the Response to the Cross Motion [Doc. # 56] ("Plaintiff's Reply").

## I.   <u>BACKGROUND</u>

From the summary judgment record, the facts of the case appear as follows. Plaintiff, the shipper, hired ATS Logistics Services, Inc. ("ATS")[2] to act as its broker to arrange the transportation of a Quench Separator Tower ("QST") from Rothschild, Wisconsin, to the Port of Houston.[3]   ATS arranged for Defendant to serve as the carrier.  Defendant hired Pathway, Inc. ("Pathway") to transport the QST on behalf of Defendant.

On September 6, 2005, Defendant and ATS entered into a Broker/Carrier Agreement [Exh. 1 to Doc. # 51-3].  As part of the Broker/Carrier Agreement, Defendant agreed to "transport shipments to and from such origins and destinations as may be designated by [ATS] from time-to-time, at the rates set forth in Exhibit A attached hereto, or agreed to in the Individual Load Confirmation delivered by [ATS] to [Defendant]."[4]  The Broker/Carrier Agreement states that "Carrier's liability for the goods shall be for the 'full actual loss' . . . ." and that "[t]he terms of the bill of lading are subordinate to the terms of this Agreement, and in the event of a conflict between

---

[2]     ATS also does business as Sureway Transportation Company.  *See* Defendant's Responses and Objections to Plaintiff's Discovery Requests [Exh. 8 to Doc. # 50-4], at 10.

[3]     It is unclear from the record when Plaintiff hired ATS and whether Plaintiff and ATS had a preexisting relationship.

[4]     Broker/Carrier Agreement, at 3.

such bill of lading and this Agreement, the terms of this Agreement shall govern."[5]

Further, the Broker/Carrier Agreement explains that:

> This Agreement with all Exhibits attached hereto represents the entire understanding and agreement hereto relating to the Transportation Services . . . Except as otherwise permitted herein, no terms, conditions, prior course of dealing, course of performance, usage of trade, understandings or agreements purporting to modify, vary, supplement or explain any provision of the Agreement shall be effective unless in writing, signed by representatives of both parties authorized to amend this Agreement.  In no event shall the preprinted terms or conditions found on any Carrier documents or acknowledgments be considered as amendment or modification of this Agreement, even if such documents are signed by representatives of both parties, and such preprinted terms or conditions shall be considered null and of no effect.[6]

The Broker/Carrier Agreement was signed by representatives of Defendant and ATS.

Plaintiff is not a party to the Broker/Carrier Agreement.

On October 24, 2008, Defendant signed ATS's Load Confirmation & Rate Agreement [Exh. B to Doc. # 51-3] ("Load Confirmation"), at 10.  The Load Confirmation identified, *inter alia*, Plaintiff (the shipper), the item being transported (the QST), the locations where the item would be picked up (Rothschild, Wisconsin) and transported to (the Port of Houston), and how much Defendant would be paid to transport the QST ($25,000.00).[7]

---

[5]     *Id.* at 6.

[6]     *Id.* at 8.

[7]     *See* Affidavit of Kevin J. Grantz [Exh. 14 to Doc. # 51-6] ("Grantz Affidavit"), at 1; Load Confirmation, at 10.

On October 31, 2008, in connection with transport of the QST, Plaintiff's employee, Michael Shea, an export and customs contact and material manager, provided a bill of lading to the Pathway driver, David Husband, who signed it.[8]   Shea obtained the form, entitled "Shipper's Domestic Truck Bill of Lading" (the "24/7 Bill of Lading") [Exh. 5 to Doc. # 51-3], from the website of an unrelated company, 24/7 Express Logistics Inc. ("24/7 Express").   Shea partially filled out the form with the particulars of the QST shipment.[9]

It is undisputed that 24/7 Express had no involvement in the QST shipment and was not a party to any of the agreements signed as part of the shipment.[10]   Other than Shea's unsolicited use of its form, 24/7 Express was not involved in any way in the events in issue.   Defendant's name is not listed on the 24/7 Bill of Lading.[11]   The 24/7 Bill of Lading states that it is "RECEIVED, subject to the 'Common Carrier Rate Agreement' or the CONTRACT between the Shipper and Carrier in effect on the date

---

[8]   Plaintiff's Admissions, at 1; Shea Depo., at 21; Deposition of David Husband  [Exh. 1 to Doc. # 50-1]("Husband Depo."), at 28.

[9]   *See* Plaintiff's Response to Defendant's Request for Admissions [Exh. B to Doc. # 48-4]  ("Plaintiff's Admissions"), at 1, 6; Deposition of Michael Shea [Exh. 2 to Doc. # 50-2] ("Shea Depo."), at 5-6.

[10]   Plaintiff's Admissions, at 3; Motion, at 7.

[11]   24/7 Bill of Lading, at 15.

of shipment . . ."[12]  The 24/7 Bill of Lading also explains that "[f]ull disclosure of terms and conditions are listed on the back of this form or visit our website www.247expresslogistics.com."[13]  Nothing was printed on the back of the form given to Husband.[14]  The Terms & Conditions of Service on 24/7 Express's website state that:

> *24/7 Express Logistics, Inc.*, liability in the absence of a higher declared value for carriage is limited to $0.50 per pound up to a maximum of $50.00 unless greater amount is declared prior to shipment, declared on the bill of lading, and applicable declared value charges paid thereon. The maximum declared value for any shipment is $10,000.00.
>
> This limitation is subject to revision as published in *24/7 Express Logistics, Inc.* tariffs in effect at the time of a shipment.  Declared value for carriage shall be subject to an excess valuation charge of $0.65 per $100.00 of declared value.[15]

The Terms & Conditions of Service additionally explain that:

> All claims for lost or damaged shipments must be submitted in writing and received by *24/7 Express Logistics, Inc.* within the prescribed limits of the date the shipment is accepted by the consignee (or reasonable time has been allowed for delivery to occur) . . . freight limits are 9 months from the date any shipment should have been delivered.[16]

---

[12]     *Id.*

[13]     *Id.*

[14]     *See* Affidavit of Thomas D. Boo [Exh. 7 to Doc. # 51-3], at 14-15.

[15]     Terms & Conditions of Service [Exh. 6 to Doc. # 51-3], at 13 (emphasis added).

[16]     *Id.* (emphasis added).

There is a dispute whether Shea and/or Husband read, were aware of, acknowledged, discussed, or expressed any intent on behalf of their employers or otherwise to adopt the Terms and Conditions of Service on 24/7 Express's website.[17]

The QST was loaded on Husband's Pathway tractor-trailer and left Rothschild for the Port of Houston on November 1, 2008.  En route, the QST on the trailer struck the underside of the I-39 Porter Drive overpass in Plover, Wisconsin.[18]  Plaintiff's personnel examined the external structure of the QST.[19]  Plaintiff alleges that both the QST and the overpass sustained visible damage.[20]  Plaintiff's personnel determined that the lifting lugs had been bent from the impact, removed the lifting lugs, and decided that Husband should continue to the Port of Houston.[21]

The QST arrived in Houston on either November 11 or 18, 2008.[22]  Lyndon

---

[17]   *See* Shea Depo., at 14-16; Husband Depo., at 9.

[18]   Plaintiff's Admissions, at 4-5; Motion, at 11.

[19]   Plaintiff's Admissions, at 5; Motion at 11.

[20]   Complaint, at 3-4; Cross Motion, at 12-13; Plaintiff's Answers to Interrogatories [Exh. D to Doc. # 48-6], at 3; Defendant's Responses and Objections to Plaintiff's Discovery Requests [Exh. 8 to Doc. # 50-4] ("Defendant's Discovery Responses"), at 11.

[21]   Cross Motion, at 13; Defendant's Discovery Responses, at 11.  An unsigned Freight Invoice [Exh. 4 to Doc. # 51-3], dated November 14, 2008, was issued by Defendant and listed the cost of the shipment.

[22]   *Compare* Delivery Receipt [Exh. 13 to Doc. # 51-6], at 4 (delivered November 11, 2008), *with* First Amended Complaint [Doc. # 13], at 4 (delivered November 18,

Jones[23] received the QST, wrote on the Delivery Receipt [Exh. 13 to Doc. # 51-6] and the Bill of Lading that the QST was in good condition except for "light scratches, scraps [sic], rust," and signed each document.  On or about November 21, 2008, the QST left the Port of Houston for Gujarat, India.

Almost a year later, on October 22, 2009, Plaintiff sent ATS a notification that the QST arrived with damaged contents and that the total amount of loss was unknown but was at least $290,000 plus labor costs.[24]  That same day, Plaintiff sent a Form for Presentation of Loss and Damage Claim [Exh. B to Doc. # 51-6] (the "Form"), at 3, to Defendant, claiming damages of $361,428.86.

Plaintiff filed suit against Defendant on September 2, 2011.  Defendant filed a Motion to Dismiss Plaintiff's Claim for Attorneys' Fees [Doc. # 8], which was granted by the Court on December 21, 2011 [Doc. # 12].  On April 30, 2012, Plaintiff filed a First Amended Complaint [Doc. # 13].  On August 30, 2012, Defendant filed a Motion for Summary Judgment [Doc. # 20].  The Court denied the Motion.[25]  The Court now turns to the parties' pending summary judgment motions.

---

2008).

[23]     The record does not reflect who Lyndon Jones is or for whom he works.

[24]     Letter Holding Carrier Liable [Exh. A to Doc. # 51-6]; Plaintiff's Admissions, at 4; Grantz Affidavit, at 2.

[25]     *See* November 16, 2012 Memorandum and Order [Doc. # 32].

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The moving party bears the burden of demonstrating that there is no evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325; *Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008). If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted). The Court construes all facts and considers all evidence in the light most favorable to the nonmoving party. *Nat'l Union*, 532 F.3d at 401.

The Court is not required to accept the non-movant's conclusory allegations,

speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413 (5th Cir. 2003)); *see also Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008) (stating that "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) (explaining that "a party's self-serving and unsupported claim" in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary). The nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (internal quotation marks and citation omitted). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Although the Court may consider other materials in the record, the Court only needs to consider cited materials. FED. R. CIV. P. 56(c)(3).

## III.   ANALYSIS

The parties agree that Plaintiff's only remedy against Defendant is under the

Carmack Amendment.[26]  The Carmack Amendment "provide[s] the exclusive cause of action for loss or damages to goods arising from the interstate transportation of those goods by a common carrier."  *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003) (emphasis omitted).  "Congress intended by the Carmack Amendment to provide a uniform national remedy against carriers for breach of the contract of carriage, including a liability for default in any common-law duty as a common carrier."  *Air Prods. & Chems., Inc. v. Ill. Cent. Gulf R.R. Co.*, 721 F.2d 483, 487 (5th Cir. 1983). The Fifth Circuit has explained that:

> [The Carmack Amendment's] attempt to supercede overlapping and sometimes differing state remedies for breach is nowhere shown to have been intended to modify the common-law duties of a common carrier under its contract of carriage, nor to eliminate recovery for their breach simply because the carrier issued a bill of lading.  To the contrary, as the decisions show, the statutory emphasis upon a carrier's liability under the bill of lading issued by it was, in the interests of shippers and consignees, to centralize in one carrier—the one that issued the bill of lading—liability for breaches in the contract of carriage, so that shippers and consignees could look to this one source (instead of seeking out fault from among connecting carriers) for damages caused by any default in the performance of the contract of carriage.

*Id.*; *see also Arnold J. Rodin, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 477 F.2d 682, 688 (5th Cir. 1973).

Defendant argues that the 24/7 Bill of Lading governs Defendant's liability, if

---

[26]      *See* Reply to Motion, at 3.

any, to Plaintiff for the damages to the QST.[27]  It asserts that under the Carmack

Amendment, 49 U.S.C. § 14706(a)(1), a bill of lading is the exclusive source of a

carrier's liability and that Plaintiff is bound by the 24/7 Bill of Lading because Plaintiff

issued it.[28]  Defendant contends, therefore, that under the terms of the 24/7 Bill of

Lading, Plaintiff is bound by the limitation of liability and the notice limitations in the

Terms & Conditions of Service on 24/7 Express's website.  Plaintiff responds that

subsection 14706(a)(1) does not dictate what agreements or documents govern

recovery under the Carmack Amendment.[29]  According to Plaintiff, the statute states

only that a shipper's exclusive source of recovery for lost or damaged property is the

party or parties listed as the carrier(s) on "the receipt or bill of lading."[30]  Plaintiff

argues further that the 24/7 Bill of Lading was merely a receipt and the Broker/Carrier

---

[27]     "A bill of lading 'records that a carrier has received goods from the party that wishes
to ship them, states the terms of carriage, and serves as evidence of the contract for
carriage.'"  *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433, 2439
(2010) (citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-18 (2004)).  General
principles of contract law govern the interpretation of a bill of lading.  *See OneBeacon
Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1098 (9th Cir. 2011) (citation omitted);
*EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1050 (3d Cir. 1993) (citations
omitted).

[28]     *See* Motion, at 14-15; Defendant's Reply, at 5-7; Defendant's Response, at 1-5.  The
Court notes that 49 U.S.C. § 14706(a)(1) directs carriers to issue a receipt or bill of
lading for property it receives.  Here, Defendant, the carrier, did not issue the bill of
lading; Plaintiff, the shipper, issued it.

[29]     *See* Plaintiff's Reply, at 1-6.

[30]     *See id.*

Agreement and the Load Confirmation constitute the contract of carriage for the shipment at issue.[31]

The Court need not decide at this pretrial juncture which of the Bill of Lading or the Broker/Carrier Agreement and Load Confirmation govern the parties' dispute. In either case, genuine issues of material fact remain. Significantly, for instance, the 24/7 Bill of Lading's incorporation clause states that the 24/7 Bill of Lading is "RECEIVED, subject to the 'Common Carrier Rate Agreement' or the CONTRACT between the Shipper and Carrier in effect on the date of shipment . . ."[32] Accordingly, even if only the 24/7 Bill of Lading between Plaintiff (the shipper) and Pathway, as Defendant's (the carrier) agent, governs Defendant's liability to Plaintiff, the terms of that document may be contingent on the terms of the Broker/Carrier Agreement and/or the Load Confirmation, documents between ATS (the broker) and Defendant (the carrier). There are genuine issues of material fact (1) whether either the Broker/Carrier Agreement and/or the Load Confirmation constitute the "Common Carrier Rate Agreement" and (2) whether those agreements are contracts "between the Shipper [Plaintiff] and Carrier [Defendant] in effect on the date of shipment." No document in the record is entitled "Common Carrier Rate Agreement."

---

[31]     *See* Cross Motion, at 10-16; Plaintiff's Response, at 9-13.

[32]     *See* 24/7 Bill of Lading, at 15.

It is also unclear whether ATS was acting as Plaintiff's agent when it entered into the Broker/Carrier Agreement and/or the Load Confirmation with Defendant.  If ATS was not acting as Plaintiff's agent when it entered into the Broker/Carrier Agreement and the Load Confirmation, Plaintiff would not be a party to the agreements.  If Plaintiff was not a party to the agreements through ATS, the terms of the agreements would not, by their own force, govern Plaintiff's relationship with Defendant.  If ATS was not acting as Plaintiff's agent and neither the Broker/Carrier Agreement nor the Load Confirmation is the "Common Carrier Rate Agreement," the terms of the agreements would not be incorporated into the 24/7 Bill of Lading through its incorporation clause.

Additionally, there are fact issues whether the parties actually intended the 24/7 Bill of Lading's Terms & Conditions of Service to bind them (to be part of the contract of carriage) and regarding the meaning of the Terms & Conditions of Service.[33]  It is unclear whether at the time Plaintiff "drafted" and Defendant (through its agent, Pathway) signed the 24/7 Bill of Lading, the Terms & Conditions of Service were available on 24/7 Express's website.  Further, it is unclear whether the parties'

---

[33]     These terms were crafted by a company unrelated to any party or this transaction (except for Shea's use of the form, an act he cannot explain, *see* Shea Depo., at 10-11, 14).  It is unclear if Plaintiff ever used the 24/7 Bill of Lading before this transaction and if Plaintiff therefore had prior notice of the Terms & Conditions of Service.  *See id.* at 10-11, 16.

representatives, Shea and Husband, had actual or apparent authority to bind the parties to the terms of the 24/7 Bill of Lading.[34]  Further, the Terms & Conditions of Service did not use the generic term "carrier" and did not refer to Defendant (or its agent, Pathway) by name.[35]  Instead, the form nonsensically states that notice of damage must be given to *24/7 Express* within "9 months from the date any shipment should have been delivered" and limits *24/7 Express's* liability to the shipper.[36]  In sum, there is no evidence regarding what the parties intended these clauses to mean.

Finally, as the Court explained in its November 16, 2012 Memorandum and Order, if the terms of the 24/7 Bill of Lading govern, there are genuine issues of material fact concerning the applicability of the $10,000 damage cap and whether Plaintiff timely filed a written claim for damage.

Accordingly, because multiple issues of material fact remain, the Court denies

---

[34]   *See* Shea Depo., at 10-11 (stating that he did not have written or verbal authority to sign the Bill of Lading), 21-22 (stating that he did not recall if before October 31, 2009, he had training concerning the management of transportation of cargo); Husband Depo., at 38 (stating that he was not involved in negotiating the terms of the Bill of Lading and that negotiations were done by someone else).  *But see* Plaintiff's Admissions, at 6 ("It is also admitted that Mr. Shea had authority to issue and sign the bill of lading which expressly provides that the carriage is "subject to the Common Carrier Rate Agreement or the CONTRACT of carriage between the shipper and carrier in effect on the date of Shipment.").

[35]   *See* Defendant's Discovery Responses, at 19.

[36]   *See* Terms & Conditions of Service, at 13.

both summary judgment motions.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Defendant Trans-United's Second Motion for Summary Judgment [Doc. # 48] is **DENIED**.  It is further

**ORDERED that** Plaintiff Siemens Water Technology Corporation's Cross Motion for Partial Summary Judgment [Doc. # 51] is **DENIED**.

SIGNED at Houston, Texas, this 29th day of **August, 2013**.

Nancy F. Atlas
United States District Judge